## No. 32,057

THE UNION PUBLIC SERVICE COMPANY, *Appellant*, v. THE CORPORATION COMMISSION OF THE STATE OF KANSAS et al., *Appellees*.

(37 P. 2d 1010)

Opinion filed December 8, 1934.

*Robert Stone, James A. McClure, Robert L. Webb, Beryl R. Johnson, Ralph Oman*, all of Topeka, and *Robert D. Garver*, of Kansas City, Mo., for the appellant.

*Payne H. Ratner*, of Parsons, *Le Roy Bradfield*, of Neodesha, *Charles W. Steiger* and *Frank Eresch*, both of Topeka, for the appellees.

The opinion of the court was delivered by

JOHNSTON, C. J.: The Ozark Pipe Line Company applied to the corporation commission of the state of Kansas for a certificate of convenience and necessity to engage in the business of distributing and delivering natural gas in Labette county, which, after extended hearings, was finally granted.

The Union Public Service Company, an auxiliary of the Cities Service Company, which was serving some of the customers in the district, took the decision to the district court for review. That court has affirmed the judgment of the commission, and the Union Public Service Company has appealed to this court. The application was filed before the corporation commission for the certificate

mentioned, and for permission to engage in the business of a public utility. The Union Public Service Company, which supplied consumers in Parsons, resisted the granting of the application before the commission. The Ozark Pipe Line Company asked for only a part of Labette county, but later amended its application to include all of the county. In the region of Labette county there are many wells and much production of gas. In 1932, when the application was made, it was shown that the Ozark Pipe Line Company had 246 wells, with a daily capacity of about three .million feet, and with adjacent fields which could be connected with the pipe lines of that company, they could produce five million feet per day when the gas was demanded by the market. It had no difficulty in supplying the state hospital with a half million feet per day, and the city waterworks with about 300,000 feet per day. On January 9, 1932, they could deliver about one million feet a day. They had 150 wells in the Mortimer field, 85 wells in the Dennis field, and there were still other wells in the field that could be hooked up if a sufficient market demanded it. There was testimony that the wells already drilled and at the time of the trial were about 400, and there were proven wells not drilled in adjacent territory which were available.

C. R. Daigh, an experienced gas man who understood the wells in the vicinity which were tapped by the Ozark Pipe Line Company, said the wells would supply five million feet a day, and if they developed more wells in the territory it would run up to twenty-five or thirty millions a day. He has been a driller and producer of gas since 1920.

Woods, who lived in Cherryvale for a number of years, was a graduate of Harvard University. He was familiar with the production of gas in Labette county, tapped by the Ozark Pipe Line Company, had production of his own connected with the line and could deliver about 600,000 feet with an open flow of about three million, and had about eight miles of main pipe line. He had sixty-two wells on twenty-three leases, and forty proven locations which have not yet been drilled.

Originally there had been negotiations with Cities Service Company to purchase gas from these producers, if they built their line and brought the gas to Parsons. Then, later, after considerable money had been spent, the Cities Service Company refused to sign the contract, first giving as a reason that the line was not yet com-

pleted, and later when Garrison, the chief owner of the Ozark Pipe Line Company, insisted that the contract should be signed he was told that the Cities Service Company was not going to sign any contract with the Ozark Pipe Line Company.

The plaintiff, which was furnishing gas to customers in Parsons, had the right to be heard in protest of granting a certificate to the Ozark Pipe Line Company, covering a part of its territory, but the evidence which has been narrated is held to be sufficient to warrant the commission in granting the certificate.

Considerable question is made about the ability of the Ozark Pipe Line Company to finance the pipe line. It had invested $33,885, of which $11,000 was indebtedness, but satisfactory arrangements for financing the balance had been made. The Ozark Pipe Line Company had twenty-four miles of pipe line. It had put in meters and compressor units, gauges and other accessories necessary to give adequate and proper service of the line. It had no outstanding bonds; the $11,000 was divided into twenty-four payments, and the creditor had no mortgage on its assets; $3,000 of the $11,000 indebtedness had been paid since the application was made, leaving only about $8,000 of that debt. The assets of the Ozark Pipe Line Company have been summarized as follows:

"ASSETS:

| | | |
|---|---:|---:|
| Cash | $2,846.41 | |
| Accounts receivable | 3,062.60 | |
| Pipe lines and equipment | 41,976.75 | |
| Leases and contracts | 25,000.00 | $72,885.76 |

"LIABILITIES AND CAPITAL:

| | | |
|---|---:|---:|
| Accounts payable | $10,346.96 | |
| Capital stock | 10,000.00 | |
| Surplus | 52,538.80 | $72,885.76" |

The time of the hearings extended over a period of about nine months, during which there were three different hearings. While there was conflicting evidence, that given in behalf of the plaintiff was mostly by its employees, while considerable testimony of an independent character was given in behalf of the Ozark Pipe Line Company. Plaintiff was shown to be financially able to finance the business as it increased and was able to add new investments as the business developed.

Many of such companies have grown from small investments at the beginning and have developed into big concerns by growth of

the business and additional investments when needed. The Ozark Pipe Line Company was a small company, but it furnished a market for quite a number of producers, many of whom had been without a market for their gas for several years.

Part of the public in Labette county were producers and greatly interested in a market for gas. The farther gas is transported the higher its price must be. These producers had wells which, when not in operation for a time, would drown out with flood water and be destroyed. The commission is composed of three men deemed to be qualified to determine the interest of the public and of the applicant, as well as that of any others who may be interested. The applicant has satisfied them and later the district court. They were capable of supplying the community with gas, and financially able to carry out the project, and were entitled to the certificate of convenience and necessity.

Without collecting and citing many authorities in support of the judgment, we refer to the closing paragraph of the opinion in *Kansas Gas & Electric Co. v. Public Service Com.*, 122 Kan. 462, 251 Pac. 1097, where it was said:

"In the granting or withholding of certificates of convenience no justiciable question touching confiscation of property or impairment of vested rights can well arise. Time and again this court, in consonance with the prevailing attitude of courts throughout the country, has declared that it will not substitute its judgment for that of some administrative tribunal created by legislative authority for dealing with matters of nonjudicial character; and certainly the question whether a competing gas company should be licensed to serve industrial plants in and around Wichita and Hutchinson is peculiarly a question for an official board to determine and one with which a judicial tribunal should be slow to meddle." (p. 468.)

There was a change in the commission while the case was pending and after some testimony had been taken, but a majority of the commission acted on the case in granting the certificate. One of the commissioners did not sign the order, but did not dissent. There is a provision in R. S. 77-201, subdiv. 4, that—

"Words giving a joint authority to three or more public officers or other persons shall be construed as giving such authority to a majority of them, unless it be otherwise expressed in the act giving the authority."

The certificate was issued by a majority of the members. Frequently a member of this board is investigating a question apart from the majority and may be unwilling to authorize it. The majority acted and issued the certificate. There is no merit in this question.

Some complaint is made that the court did not issue a subpœna *duces tecum* requiring the president of the company to go back to Parsons and bring with him a book of accounts showing capital investment; showing the items filed in exhibit A that was presented to the commission; showing the wells with which the president had been connected, the open flow at the takes of the wells and the available supply of gas. The end of the trial had about been reached when this request was made. The Ozark Pipe Line Company had furnished the commission a detailed list of all the wells together with all pertinent information relative to each well. The plaintiff had cross-examined the witnesses or had an opportunity to do so. The case had been pending about eight or nine months and there were three different hearings of the case, and now, at the end of the trial, the plaintiff was proposing to start in anew and retry most of the questions in the case.

Objections were made because plaintiff had had plenty of time to get these things but had not asked for them, and that it would force additional delay. The request was refused. We think they had already had time to make the request if it was important or necessary and the court concluded that they were not entitled to the subpœna. The case had been pretty thoroughly tried and the items mentioned, if of any importance, should have been produced before this time.

The judgment is affirmed.